IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NEIL COLLIER BELL,                        :
                                          :
              Plaintiff,                  :
                                          :
       v.                                 :        CIVIL ACTION NO.
                                          :        1:05-CV-1057-JOF
DELTA AIR LINES, et al.,                  :
                                          :
              Defendants.                 :

OPINION AND ORDER

This matter is before the court on Plaintiff's motion for leave to file excess pages [33-1]; Plaintiff's motion for partial summary judgment [34-1]; Defendants' motion for summary judgment [46-1]; Plaintiff's motion for leave to file excess pages [48-1]; and Plaintiff's motion for leave to file excess pages [49-1].

I.     Background

       A.     Procedural History and Facts

Plaintiff, Neil Collier Bell, filed suit against Defendants, Delta Air Lines, Inc., Officer D.C. Cantrell, and the City of Atlanta, pursuant to 42 U.S.C. § 1983 and various state law claims, alleging that Officer Cantrell and the City of Atlanta violated her Fourth Amendment rights because Officer Cantrell unlawfully seized her, and the City of Atlanta was deliberately indifferent to a practice of arresting citizens without probable cause.   She further contends

that the City of Atlanta violated her First Amendment rights due to an unconstitutional ordinance.

      1.    <u>Interaction with Ms. Lawson</u>

On December 30, 2002, Plaintiff arrived at Hartsfield International Airport with her three teenage daughters, Johanna, Laura, and Leslie Kearns. They were scheduled to fly on Delta Flight 1605 to Denver, Colorado for a family vacation. Flight 1605 was scheduled to depart from Gate B-23 at 8:15 a.m. When Plaintiff and her daughters arrived at the gate at approximately 8:12 a.m., the door to the jetway had already been closed.

Plaintiff testified that when she got to the gate, she went up to the podium.[1] Jona Lawson, the Delta gate agent, had just finished checking a gentleman in for the flight, but when Plaintiff got up to the counter, Ms. Lawson told her she had closed the flight. Plaintiff asked her if she could please let her and her daughters on the flight and Ms. Lawson would not respond to Plaintiff. Plaintiff testified that she never raised her voice, yelled, screamed, cursed, or lost her temper with Ms. Lawson. She testified that she never went around the podium or shoved her boarding passes in Ms. Lawson's face. Ms. Lawson left and Plaintiff testified that Sondra Nared, another Delta gate agent, came up to the podium from her station

———————————————————

[1]On Defendants' motion for summary judgment, the court construes the facts in the light most favorable to Plaintiff. However, the court includes the testimony of various witnesses to the extent it is relevant for Fourth Amendment and qualified immunity analyses.

2

in the jetway, and told Plaintiff that the flight was closed.  Ms. Nared then told Plaintiff if she did not leave the gate, Ms. Nared was going to call the police.

Ms. Lawson testified that Plaintiff became very belligerent when she learned that she and her daughters would not be permitted to board the flight.  She yelled and screamed at Ms. Lawson and used profanity.  Despite Ms. Lawson's attempts to calm Plaintiff, Plaintiff continued to yell in such a loud manner that Ms. Lawson telephoned the control tower to report the incident to her supervisor, Betty Smiley.  Plaintiff followed Ms. Lawson around the podium at the gate, shoved her ticket into Ms. Lawson's face, and demanded to be allowed on the plane.  Eventually, Ms. Lawson accepted Ms. Nared's offer to switch places with her.  Ms. Nared testified that she was in the jetway waiting for the plane to move out to the tarmac so that she could close the jetway door and pull the jetway back.  While she was waiting for the plane to push back, she called the front podium and spoke to Ms. Lawson.  She could tell something was wrong.  Ms. Lawson told Ms. Nared that she had an irate passenger.  Ms. Nared offered to trade places.

Deborah Merz, a passenger who was sitting in the waiting area at Gate B-23 and witnessed the incident, testified that Plaintiff came up to the podium approximately five to ten minutes after the final call for passengers was made.  Plaintiff repeatedly insisted to Ms. Lawson that she had tickets for the flight and had to get on the plane.  In a statement she gave to Officer Cantrell shortly after the incident, Ms. Merz stated that Plaintiff was "argumentative and insistent and unreasonable to the Delta gate agent to the point of abuse."

3

Plaintiff was "very aggressive towards the agent, jumping up and down, following the Delta agent."   Ms. Merz did not hear Plaintiff use profanity, but did agree that Plaintiff had shoved her tickets and boarding information in the agent's face.   After the incident concluded, Ms. Merz saw Ms. Lawson in the terminal area and told her that she felt very bad about the situation she had just had to endure.

Kathleen Moehring, another passenger, similarly testified that Plaintiff was loud, belligerent, and threatening in her actions by leaning up over the counter.   Ms. Moehring was worried for the ticket agent.   Ms. Moehring described Plaintiff as "out of control" and as "verbally abusing" the Delta ticket agent.

Kenneth Bearden, a third passenger, also witnessed the incident.   He informed a police officer that he had seen the events and the officer gave him a pen and paper to write out a statement.   Mr. Bearden's statement said that Plaintiff arrived in the gate area but was informed the flight had closed.   Plaintiff began "harassing" the agent and demanding to be put on the flight.   The agent informed Plaintiff that if she did not calm down, the agent would have to call security, but Plaintiff continued her "harassment."   Mr. Bearden described Plaintiff as "irate" and "frantic."   Mr. Bearden saw Ms. Lawson call for security.

4

2.    Interaction with Officer Cantrell

After Plaintiff's interaction with Ms. Lawson, Plaintiff and her daughters left Gate B-23 for Gate B-36, where the next flight to Denver was scheduled to depart.   Ms. Nared escorted Officer Cantrell to Gate B-36 and pointed out Plaintiff to him.   Plaintiff testified that she was on her cell phone attempting to reschedule her flight when Officer Cantrell came up and told her to get off the phone.  He asked her for her identification without explaining why he wanted it.  She asked him why he wanted it.  He did not respond and she told him, "I'll do what I want."   (In a second deposition, Plaintiff testified that Officer Cantrell told her that Delta had complained that she was using foul language at the gate.)   Officer Cantrell told her he needed to see her license and she gave it to him.   Plaintiff testified that Officer Cantrell returned to Ms. Nared and spoke with her some more and then came back and arrested Plaintiff.   She testified that she did jerk away from Officer Cantrell when he attempted to put handcuffs on her.

Ms. Nared testified that when Officer Cantrell approached her at Gate B-23, she "told him that Ms. Lawson would know more, but from my understanding, what Ms. Lawson told me, that's what I told him.  We had an irate passenger that she felt threatened by and we switched places and, yes, I could – I know what she looks like.  She's with some children." *See* Nared Depo., at 30.   Ms. Nared told Officer Cantrell that Plaintiff "was irate with two children and the children were saying Mom, stop." *Id.* at 35.   She also testified that as she walked with Officer Cantrell to Gate B-36, "I explained to him what happened, what I saw, at my gate,

5

B23." *Id.* at 45.   Ms. Nared testified that when Officer Cantrell asked Plaintiff for her identification, Plaintiff said, "why do you need my I.D.?"   *Id.* at 39.   Plaintiff then came behind the podium at Gate B-36 where Ms. Nared was standing.   Plaintiff had her identification out and the officer attempted to get the identification, but Plaintiff jerked back and the officer arrested Plaintiff. *Id.*

Mr. Bearden was still at Gate B-23 when the officers arrived there.   He testified that the gate agent walked with the officers to point out Plaintiff to them.   She was standing several gates down from B-23.   Mr. Bearden stated that the officers approached Plaintiff and she tried to avoid them.   Mr. Bearden wrote in his statement that Plaintiff was asked repeatedly by the police officer to calm down, but she continued her "harassing behavior."   He also wrote that Plaintiff pulled away from the officer when he attempted to handcuff her, was hostile, and was not cooperating with the officer.

Ms. Lawson testified that when she switched places with Ms. Nared and went down to the jetway, she encountered an officer coming up the jetway.   *See* Lawson Depo., at 36.   She stated he had been called because of the passenger on the plane who was upset because her husband had not yet boarded the flight.   *Id.* at 37.[2]   Ms. Lawson did not speak to this officer

---

[2]Prior to the time Plaintiff and her daughters arrived in the gate area, a passenger who was already on board Flight 1605 became disruptive because her husband had not boarded the flight when the jetway was closed.   No witness was able to testify as to whether Officer Cantrell had been called to the gate to deal with that passenger or Plaintiff.   Eventually, the passenger on the plane deplaned.

and did not speak to Officer Cantrell prior to giving him her statement after Plaintiff had been arrested. *Id.* at 44-45. During the course of the incident, Ms. Lawson did contact the tower and tell them that she needed a supervisor or security at the gate to deal with "an irate passenger." *Id.* at 54-55.

3.    Officer Cantrell's Testimony

Officer Cantrell testified that when he arrived at Gate B-23, he actually witnessed Plaintiff "carrying on" with Ms. Lawson and tried to get between her and Ms. Lawson. Plaintiff continued yelling and jumping around. Both he and Ms. Lawson asked Plaintiff to move from behind the counter, and Plaintiff responded that she was not moving until she was told something by the agent. He approached Plaintiff at Gate B-23 and arrested her there. He testified that he never went to Gate B-36.

In his incident report, Officer Cantrell wrote:

On listed date I responded to a SIG 29 (fight) call at Gate B-23. Upon arrival I met with Delta Gate Agent J. F. Lawson. Ms. J. F. Lawson advised a white female had arrived after the flight was closed and told her she would have to rebook on another flight. At this time the female Mrs. N.C. Bell became very loud and irrational and began demanding to be put on this flight. Upon my arrival I was pointed to Mrs. N.C. Bell as I attempted to talk to her to get her to calm down she Mrs. N.C. Bell stated I'll do what I want to in a loud voice. I asked her several times to calm down. At this time the gate agent walked behind her ticket counter. Mrs. N.C. Bell ran behind the counter yelling at the gate agent demanding she be let on her flight. The agent J. F. Lawson told her Mrs. N.C. Bell she was not allowed behind the ticket counter and she needed to move. At this time, Mrs. N.C. Bell stated "I'm not moving until you tell me something." I asked J. F. Lawson [sic] to come from behind the counter. She looked at me and stated "When she tells me something, wait a minute." I advised Mrs. N.C. Bell she was under arrest for disorderly conduct, as I began

7

to put her in cuffs she repeatedly attempted to pull away from me.  Mrs. N.C.
Bell was charged as listed and transported to City of Atlanta Pretrial Detention.

Incident Report, at 1-2.  Although difficult to read, the arrest citation indicates that Plaintiff acted "irrational when asked repeatedly to calm down.  She yelled that I'll do what I want.  Continued to act irrational – in an irrational manner towards police when advised she was under arrest.  This occurred in front of women and children."  *See* Cantrell Depo., at 26.  In addition to this information, Officer Cantrell testified that Ms. Lawson gave to him "some pieces of paper that had witnesses' statements on it."  *See* Cantrell Depo., at 19.

Officer Cantrell stated that he believed he could have arrested Plaintiff pursuant to City of Atlanta Ordinance Section 106-81 or O.C.G.A. § 16-11-39, but decided to cite Atlanta Airport Ordinance § 22-105(a) because it was a lesser violation, and if he had arrested her on the state violation, she would have had to go to Clayton County for processing.  *See* Cantrell Depo., at 48 ("I could actually have put several charges on her.  You can call it the holiday spirit or what you want to call it, but, I don't know, I don't like to just go out there and put all the charges on somebody I can.  I could have put a State charge on her for Disorderly Conduct; I could have put a State charge of Obstruction of Officer on her charge also, and also could have put her profane and abusive language in front of women and children on her also, and all those would have been State charged.").

     4.     Remaining Information

8

The records of the City of Atlanta Police Department and a tape of Officer Cantrell's communications with headquarters during the incident in question indicate that one call came in from the tower indicating there were two male passengers at Gate B-23 threatening females. Another call came in reporting two white females using profanity. Officer Cantrell arrived at gate B-23 at approximately 8:30 a.m. but had not located Plaintiff. He then reported to dispatch that the gate agent said they were using a lot of profanity, and she would look in the bathroom to see if they went in there. Officer Cantrell next reported to dispatch that he was following the direction of a gate agent and would either make an arrest of Plaintiff or present her with a citation. He then reported: "We're back en route to B Baker 23; we just arrested at B Baker 36." Officer Cantrell's incident report states the time of incident as 8:40 a.m.

After Plaintiff's arrest, she was taken to a holding facility at the airport where Ms. Lawson came to identify her. Plaintiff was then transported to the Atlanta City Jail, was booked, and was released that same day. Plaintiff's arraignment was scheduled for December 31, 2002. At arraignment, the City of Atlanta Municipal Court dismissed the disorderly conduct because no one from the City of Atlanta or Delta appeared in court for Plaintiff's hearing. Plaintiff boarded a Delta flight to Colorado that day to join her daughters.

**B.    Contentions**

Plaintiff first contends that Atlanta Airport Code Section 22-105(a) is facially unconstitutional because it is vague and overbroad and places no limitation on what amounts

9

to disorderly conduct.  Plaintiff avers that because the ordinance is unconstitutional, the City of Atlanta can be held liable for Officer Cantrell's illegal seizure of her pursuant to the ordinance.  Plaintiff also argues that Defendants are liable to her for state law claims of false arrest, false imprisonment, malicious prosecution, assault and battery, and intentional infliction of emotional distress because her arrest violated O.C.G.A. § 17-4-20(a), which discusses when warrantless arrests are permitted.

Defendants respond that Officer Cantrell had probable cause to arrest Plaintiff for violations of City of Atlanta Ordinance Section 106-81 or O.C.G.A. § 16-11-39, and therefore, her arrest did not violate Plaintiff's First or Fourth Amendment Rights.  Defendants also argue that Plaintiff has not presented any evidence to show that the City of Atlanta had a custom or policy of permitting arrests without probable cause.  Finally, Defendants argue that the City and Officer Cantrell are immune from suit under Plaintiff's state law claims.

10

## II.     Discussion

### A.     Fourth Amendment and Qualified Immunity

An arrest made without probable cause violates the Fourth Amendment's right to be free from unreasonable searches and seizures. *See*, *e.g.*, *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003). For probable cause to exist, an arrest must be objectively reasonable under the circumstances. *See Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Wood v. Kesler*, 323 F.3d 827, 878 (11th Cir. 2003). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)). Finally, the "validity of the arrest does not turn on the offense announced by the officer at the time of the arrest." *Lee*, 284 F.3d at 1195-96.[3]

---

[3]Because the validity of the arrest does not turn on the validity of Section 22-105(a) of the City of Atlanta Airport Ordinance, the court need not determine whether it is unconstitutionally overbroad and vague facially or with respect to Plaintiff's actions here. If Officer Cantrell had probable cause to arrest Plaintiff under some other statute, then there is no Fourth Amendment violation in her arrest, and the court need not address Plaintiff's dependent First Amendment claim. Therefore, the court DENIES AS MOOT Plaintiff's motion for partial summary judgment [34-1].

"[O]fficers who make an arrest without probable cause are still 'entitled to qualified immunity if there was arguable probable cause for the arrest.'" *Durruthy*, 351 F.3d at 1089 (quoting *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999)).  "Arguable probable cause exists when 'an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed.'"  *Id.* (quoting *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997)).  "'Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors.'"  *Id*. (quoting *Lee*, 284 F.3d at 1195)).  Qualified immunity shields an officer "so long as she had probable cause to arrest [the civil plaintiff] for any offense."  *Id*. at 1089 nn.6 & 7 (emphasis in original).

Under O.C.G.A. § 16-11-39(a), "a person commits the offense of disorderly conduct when such person commits any of the following:  (1) Acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health."  *Id*.  In *Brown v. State*, 246 Ga. App. 517 (2000), two employees of a towing company were instructed to tow cars illegally parked in an apartment complex parking lot.  While they began their task, the defendant approached one of the employees and asked him what he was doing.  The defendant angrily told the employee "That's my so-and-so car."  The defendant pushed the employee and told him, "I'll kill you.  If I ever catch you at a gas station or food mart, I'll beat you up."  *Id*. at 517.  A police officer was

12

called to the scene.   The defendant denied to the officer that he ever threatened to kill the employee, but did admit that he threatened to "kick their ass."   The officer arrested the defendant.   *Id.* at 517-18.   The defendant appealed his conviction, arguing that there was not sufficient evidence.   The court, however, found that the defendant admitted he threatened the employee and the employee testified he was in fear for his safety.   Thus, the court concluded, there was sufficient evidence to sustain the conviction.   *Id.* at 518.

The important question for the Fourth Amendment is what Officer Cantrell knew prior to arresting Plaintiff.   Here, even if we accept Plaintiff's view of the sequence of the events, Officer Cantrell was informed that two separate calls came into dispatch regarding irate passengers using profanity at Gate B-23.   No individual was able to testify as to the source of that information, and thus, the court would not find this information alone sufficiently trustworthy for an officer to rely upon.   However, once he arrived on the scene – even discounting his testimony that he witnessed the events in question – Ms. Nared testified that she told Officer Cantrell "that Ms. Lawson would know more, but from my understanding, what Ms. Lawson told me, that's what I told him.   We had an irate passenger that she felt threatened by and we switched places and, yes, I could – I know what she looks like.   She's with some children."   "I explained to him what happened, what I saw, at my gate, B23."   *Id.* at 45.   She also told Officer Cantrell that Plaintiff "was irate with two children and the children were saying Mom, stop."   Her testimony is undisputed.   Similarly, the radio communications show that when Officer Cantrell arrived at the gate, the gate agent repeated to him that an irate

13

passenger was using profanity.  Based on the facts that Ms. Nared related to Officer Cantrell, and the information Officer Cantrell had received from dispatch, the court finds that even if Officer Cantrell did not witness Plaintiff's behavior, he had probable cause and, at the very least, arguable probable cause to arrest her for disorderly conduct.

The crux of Plaintiff's case seems to be that because Officer Cantrell "lied" about his location at the time of Plaintiff's arrest and whether he actually viewed her behavior, the entirety of the arrest is tainted.  The court does not agree.  Even if Officer Cantrell did not witness Plaintiff's behavior, the totality of the information provided to him provided arguable probable cause for Plaintiff's arrest.  The court finds *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004), cited by Plaintiff, to be distinguishable.  There, the police officer defendants were accused of manufacturing the very evidence which they alleged gave probable cause to arrest the plaintiff for driving under the influence of marijuana.  Here, even if the court believes Plaintiff's theory that Officer Cantrell was lying concerning his whereabouts, there is no accusation that he fabricated the incident leading to Plaintiff's arrest.  Furthermore, statements from other witnesses corroborate that Plaintiff was involved in some kind of confrontation with the airline gate agent.  The court recognizes that Plaintiff disputes she ever raised her voice or acted in a disorderly manner, however, Plaintiff's testimony does not extinguish the arguable probable cause provided to Officer Cantrell by the information provided by Ms. Nared.  For the foregoing reasons, the court finds that Plaintiff cannot establish a Fourth Amendment violation and further that Officer Cantrell would be entitled to

14

qualified immunity on the Fourth Amendment claim.   In light of that holding, Plaintiff's §

1983 malicious prosecution claim also fails.

**B.**      **Municipal Liability**

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court

held that municipalities (and other local government entities) are "persons" within the

meaning of 42 U.S.C. § 1983. The Court, however, consistently has declined to hold

municipalities liable under a theory of respondeat superior.   *See*, *e.g.*, *Pembaur v. Cincinnati*,

475 U.S. 469, 479 (1986).   Rather, a plaintiff must demonstrate a municipal "policy" or

"custom" that caused the plaintiff's injury in order to establish a municipality's liability.   *See*,

*e.g.*, *Canton v. Harris*, 489 U.S. 378, 389 (1989).   The plaintiff must also show that "through

its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."

*Board of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).   To impose

liability on the City of Atlanta for failing to act to preserve a constitutional right under section

1983, Plaintiff must show (1) that her constitutional rights were violated; (2) that the City of

Atlanta had a policy or custom that constituted a deliberate indifference to her constitutional

right; and (3) that the violation was caused by the policy or custom.   *See Canton*, 489 U.S. at

388.

In *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999), the Eleventh Circuit further

stated that a "plaintiff seeking to impose liability on a municipality under § 1983 [must]

identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."   *Id.* at 1105

15

(quotations and citations omitted).  "A custom is a practice that is so settled and permanent that it takes on the force of law."  *Id.*  "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice.  Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality."  *Id.*  "A plaintiff must show that the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences."  *Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000).

Plaintiff has presented no evidence to show that the City of Atlanta had a policy or custom of being deliberately indifferent to arrests made without probable cause, and thus, the court GRANTS Defendants' motion for summary judgment as to Plaintiff's Fourth Amendment claims.

16

C.      **State Law Claims**

Plaintiff also raises state law claims of (1) false arrest, (2) false imprisonment, (3) malicious prosecution, (4) assault and battery, and (5) intentional infliction of emotional distress.

"The essential elements of the cause of action for false imprisonment are a detention of a person of another for any length of time, and the unlawfulness of that detention." *See, e.g., Mitchell v. Lowe's Home Centers, Inc.*, 234 Ga. App. 339, 340-41 (1998) (citing O.C.G.A. § 51-7-20). "The existence of probable cause standing alone is not a complete defense in a false imprisonment case because, even if probable cause to believe a crime has been committed exists, a warrantless arrest would still be illegal unless it was accomplished pursuant to one of the 'exigent circumstances'" set forth in O.C.G.A. § 17-4-20. *Arbee v. Collins*, 219 Ga. App. 63 (1996). "Thus, the defense of a warrantless arrest in a false imprisonment case must show that the arrest was made on probable cause and pursuant to the appropriate exigent circumstances." *Id.* The court must determine, then, whether Plaintiff's arrest complied with O.C.G.A. § 17-4-20(a). That statute provides, "An arrest for a crime may be made by a law enforcement officer either under a warrant or without a warrant if the offense is committed in such officer's presence or within such officer's immediate knowledge." *Id.* Because there is a dispute of fact as to whether Officer Cantrell actually witnessed Plaintiff's behavior toward Ms. Lawson, it is not clear that Officer Cantrell's arrest of Plaintiff complies with the statutory requirements of O.C.G.A. § 17-4-20. Officer

Cantrell, however, argues that he is entitled to official immunity under state law.   Similarly, the City of Atlanta contends that it is entitled to sovereign immunity for Officer Cantrell's actions.

The court agrees that the City of Atlanta is entitled to sovereign immunity with respect to Officer Cantrell's actions.  *See City of Atlanta v. Heard*, 252 Ga. App. 179, 181 (2001). In Georgia, the doctrine of official immunity "protects individual public agents from personal liability for discretionary acts taken within the scope of their official authority, and done without wilfulness, malice, or corruption."  *See Sommerfield v. Blue Cross & Blue Shield of Georgia, Inc.*, 235 Ga. App. 375, 376 (1998).  No party disputes that Officer Cantrell's arrest of Plaintiff was a discretionary act.   Thus, Officer Cantrell may only be held liable if his acts were done with actual malice or intent to cause injury.  *See Gilbert v. Richardson*, 264 Ga. 744, 753 (1994); *Todd v. Kelly*, 244 Ga. App. 404, 407 (2000).   "Actual malice" denotes "express malice or malice in fact."  *See Merrow v. Hawkins*, 266 Ga. 390, 391-92 (1996).   The Supreme Court of Georgia has also described "actual malice" as "a deliberate intention to do a wrongful act."  *See Adams v. Hazelwood*, 271 Ga. 414, 415 (1999).

Plaintiff claims that Officer Cantrell's alleged perjury with regard to whether he actually witnessed Plaintiff's behavior is sufficient to establish that he acted with "actual malice."   Plaintiff, however, provides no citation for this assertion.   Furthermore, the court finds that Officer Cantrell's actions subsequent to the arrest cannot demonstrate that the arrest at the time it was made was conducted with actual malice.   Just as the court may only consider

18

the information as known to the officer at the time of the arrest to evaluate Plaintiff's Fourth Amendment claims, the court finds that a later action by Officer Cantrell itself cannot retroactively convert his behavior at the time to acts of "actual malice."

Plaintiff also asserts that in his deposition, Officer Cantrell stated that Plaintiff did not treat him with respect and that he believed she should have presented her identification to him. While these facts might be relevant as to whether Plaintiff could have been cited for obstruction of an officer with respect to her interaction with Officer Cantrell immediately prior to the arrest, they are not sufficient to demonstrate that Officer Cantrell acted with "actual malice." Thus, the court finds that Plaintiff has not presented any evidence to show that Officer Cantrell had deliberate intent to do a wrongful act. Accordingly, the court finds that Officer Cantrell is entitled to official immunity and GRANTS Defendants' motion for summary judgment as to Plaintiff's state law claims.

Because the court finds that the City of Atlanta is entitled to sovereign immunity and Officer Cantrell to official immunity with respect to Plaintiff's state law claims, the court need not address them further. In the alternative, however, the court also finds Plaintiff's remaining state law claims lacking on their merits.

In Georgia, to succeed on a claim of intentional infliction of emotional distress, Plaintiff must prove (1) intentional or reckless conduct; (2) extreme and outrageous conduct; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress. *See Phinazee v. Interstate Nationalease, Inc.*, 237 Ga. App. 39,

39-40 (1999).   Whether the conduct alleged is egregious enough to sustain a claim of intentional infliction of emotional distress is a question of law.   *Id.* Georgia courts have determined that:

> [i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so   outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id.* (citations and quotations omitted).  In *Jarrard v. United Parcel Service, Inc.*, 242 Ga. App. 58, 62 (2000), where an employer gave an employee a harsh performance evaluation on the day the employee returned from extended psychiatric care and continued the evaluation despite the employee's tearful requests for postponement, the court of appeals did not find outrageous conduct, despite the fact that plaintiff alleged malicious motivation of the employer because of the employee's prior complaints about transfers.  *Id.* at 148.  *See also Fox v. Ravinia Club, Inc.*, 202 Ga. App. 260 (1991) (finding no outrageous conduct where plaintiff's supervisor spoke to her in a "hostile, intimidating and abusive manner" and gave her false reasons for termination).

Here, even accepting the allegations raised by Plaintiff in her complaint, the court finds that Plaintiff fails to state a claim for intentional infliction of emotional distress.   *Cf. Miraliakbari v. Pennicooke*, 254 Ga. App. 156 (2002) (no intentional infliction of emotional

20

distress where employer ordered plaintiff to remain at work after plaintiff learned that her son had been injured at school, employer refused to let employee call school to ask about son's injuries, pulled plug on the phone when the employee attempted to call the school, threatened employee that she would be fired if she left work, and ordered employee to stop crying and return to work).

The elements of the common law tort of malicious prosecution are:  (1) a criminal prosecution, (2) instigated without probable cause, (3) with malice, (4) under a valid warrant, (5) that terminated in favor of the plaintiff, and (6) caused damage to the plaintiff accused. *See Wal-Mart Stores, Inc. v. Blackford*, 264 Ga. 612, 613 (1994).  Similarly, under Georgia law, the elements of a false arrest tort are (1) an arrest under the process of law, (2) without probable cause, (3) made maliciously, (4) with prosecution terminating in favor of complaining party.  *See, e.g., Desmond v. Troncalli Mitsubishi*, 243 Ga. App. 71 (2000) (citing O.C.G.A. § 51-7-1).  Thus, probable cause or the lack thereof is an element of each of these torts.  Because the court found above that Officer Cantrell had probable cause to arrest Plaintiff, Plaintiff's state law false arrest, malicious prosecution, and assault and battery claims also fail.

## III.    Conclusion

The court GRANTS Plaintiff's motion for leave to file excess pages [33-1]; DENIES AS MOOT Plaintiff's motion for partial summary judgment [34-1]; GRANTS Defendants'

21

motion for summary judgment [46-1]; GRANTS Plaintiff's motion for leave to file excess pages [48-1]; and GRANTS Plaintiff's motion for leave to file excess pages [49-1].

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.

**IT IS SO ORDERED** this 21st day of March 2006.

<u>      s/ J. Owen Forrester      </u><br>
J. OWEN FORRESTER<br>
SENIOR UNITED STATES DISTRICT JUDGE

22